# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

V.                                    Docket No. 1:98-cr-00258-JKB

AHMAD S. LINTON,

Defendant.

# PRO-SE MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A) FOR IMMEDIATE RELEASE, AND EMERGENCY MOTION

## INTRODUCTION

COMES NOW, the Defendant Ahmad S. Linton, pro se, (hereinafter, "Linton" or "Defendant") and respectfully moves this Honorable Court pursuant to the newly amended 18 U.S.C. §3582(c)(1)(A)(i) for an order reducing his sentence to time served based on his age (45), COVID-19, and his post-conviction rehabilitation. Linton's circumstances satisfy the "extraordinary and compelling reasons" under §3582, as elaborated by the Sentencing Commission in U.S.S.G. §1B1.13. After considering the applicable factors set forth in 18 U.S.C. §3553(a), Linton respectfully request that the Court grant his request for compassionate release and reduce his sentence to time served.

In support thereof Linton puts forth the following:

1

## JURISDICTION

This Court has jurisdiction pursuant to the First Step Act of 2018 which amended 18 U.S.C. Section 3582(c)(1)(A) allowing the Court to grant compassionate release to defendants who may exhibit "extraordinary and compelling" circumstances after applying the factors set forth under 18 U.S.C. Section 3553(a).

## LINTON IS DESRVING IS OF A SENTENCE REDUCTION

With the passage of the First Step Act, Congress emphasized the imperative of reducing unnecessary incarcerations and avoiding unduly punitive sentences that do not serve the ends of justice. United States v. Simons, No. 07-cr-00874, 2019 WL, at'*8 (E.D.N.Y. Apr.22, 2019).

If Linton was convicted today of the same crime, he would be a sentenced to less than 20 years under Alleyne. That is, under the correct statutory and constitutional interpretation Linton has served more time than the law allows.

Furthermore, Linton is a model of rehabilitation. He has spent his time in prison improving himself, helping those around him, and working toward justice for himself and others. He has demonstrated an unwavering commitment to becoming a productive member of society and a responsible man. He has learned invaluable skills, all of which he plans to put to use when working with at-risk youths and community organizations. Simply put, Linton's life prospects are very bright for a man who has spent the past 20 years incarcerated, and he has a network of supporters willing and able to assist him in his transition back into the community.

## PROCEDURAL HISTORY

Linton was convicted in this court of conspiracy to distribute cocaine and conspiracy to commit murder in aid of racketeering and sentenced to life imprisonment. The judgment was affirmed on direct appeal. See United States v. Linton, 62 Fed. Appx. 352 (4th Cir. 2003). His petition for certiorari to the United States Supreme Court was denied. See Ahmad v. United States, 540 U.S. 930 (2003). On June 29, 2005, this court denied Linton's motion to vacate his sentence pursuant to 28 U.S.C. § 2255. The United States Court of Appeals for the Fourth Circuit dismissed his appeal on June 24, 2009. See United States v. Linton, No. 09-6389 (4th Cir. 2009). On January 30, 2013, Linton filed a section 2255 motion. All post-conviction motions were denied.

# EXHAUSTION OF REMEDIES

Linton concedes that he has not completely exhausted his Administrative remedies as required under Section 3582(c)(1)(A) (Linton's request was denied by the Warden on April 5, 2020, but was not appeal, see attachments). However, due to the emergency nature of this filing time may not permit full exhaustion before fatalities ensue. As such, Linton relies on relevant case law which allows for the waiver of exhaustion. Specifically, recently, Courts have recognized that exhaustion "is not absolute." See, Washington v. Barr, 925 F.3d 109, 118 (2d Cir. 2019) (citing McCarthy v. Madigan, 503 US 140, 146-147 (1992).

Even when faced with statutory exhaustion requirements, however, the Supreme Court has allowed claims to proceed notwithstanding a party's failure to complete the administrative exhaustion process "where a claimant's interest in having a particular issue resolved is so great that deference to the agency's judgment is inappropriate." Mathews v. Eldridge, 424 US 319, 330 (1976). This is the reasoning that prompted the Second Circuit's decision in Washington, 925 F.3d at 118 to waive exhaustion. See also, Jones v. Bock, 549 US 199 *2007) (exhaustion of remedies is an affirmative defense and is not jurisdictional).

It is well settled that exhaustion may be waived under three (3) conditions: (1) where it would be "futile"; (2) where the administrative process would "incapable of adequate relief"; and (3) where pursuing agency review would "subject [movant] to undue prejudice."

Here, these exceptions exist and allow this Court to use its discretionary powers and waive the exhaustion requirement. First, futility, (i.e. "undue delay") here has the grave potential for a pure catastrophe resulting in death, multiple deaths and/or multiple infections. Second, the relief the agency might provide could, because of undue delay, ultimately become "inadequate." Lastly, Linton could be prejudiced which, in this case, could result in death if he is unable to practice "social distancing" which the scientific experts are demanding as a fist line of defense. See, Bowen v. City of New York, 476 US 467, 483 (1986) (holding that irreparable injury justifying the waiver of exhaustion requirements where "the ordeal of having to go through the administrative process may trigger a severe medical setback."); Abbey v. Sullivan, 978 F.2d 37, 46 (2d Cir. 1992) ("[I]f delay attending exhaustion would subject claimants to deteriorating health, ...then waiver may be appropriate"); New York v. Sullivan, 906 F.2d 910, 918 (2d Cir. 1990) (same).

With More Than 300,000 Prisoners Locked Down. Prisoners struggle to get their medical records and the necessary document for exhaustion of remedies. Inmates are locked in their cells 23 hours, relying on in-person, confidential meetings with staff (i.e., counselors, case manager, unit officers, or lawyers) is extremely difficult, although not impossible. The law library is closed, no copy machines are available to make duplicate copies, commissary is often closed, thus making stamp purchase impossible, and untimely mailing services, all of these circumstances making the exhaustion of Administrative Remedies nearly impossible. See, Carmona v. U.S. Bur. of Prisons, 243 F.3d 629, 634 (2d Cir. 2001) (while prior to filing a habeas corpus petition under § 2241 "federal prisoners must exhaust their administrative remedies [w]hen, however, legitimate circumstances beyond the prisoner's control preclude him from fully pursuing his administrative remedies, the standard we adopt excuses this failure to exhaust").

The Federal Bureau of Prisons (BOP) is now on rigid national lockdown due to nationwide rioting in addition to its previously stringent lockdown and quarantine constraints amid the rapidly escalating public health crisis COVID-19. Therefore, the defendants do not have the opportunity to follow all the rules, procedures, or the ability to exhaust all administrative remedies and make all deadlines.

Accordingly, Linton respectfully requests this Court apply the doctrine of waive and move to the merits of his request.

## DISCUSSION

## A. THIS COURT HAS AUTHORITY TO RESENTENCE THE DEFENDANT UNDER 18 U.S.C. § 3582(c)(1)(A)(i) FOR THE "EXTRAORDINARY AND COMPELLING REASONS" CREATED BY THE COVID-19 PANDEMIC AND THE PRISON CONDITIONS WHICH PREVENT SELF-CARE FOR A HIGH-RISK PATIENT

With the changes made to the compassionate release statute by the First Step Act, courts need not await a motion from the Director of BOP to resentence prisoners under 18 U.S.C. § 3582(c)(1)(A)(i) for "extraordinary and compelling reasons."

Importantly, the reasons that can justify resentencing need not involve only terminal illness or urgent dependent care for minor children.

Congress first enacted the modern form of the compassionate release statute, codified at 18 U.S.C. § 3582, as part of the Comprehensive Crime Control Act of 1984. Section 3582(c) states that a sentencing court can reduce a sentence whenever "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). In 1984, Congress conditioned the reduction of sentences on the BOP Director's filing of an initial motion to the sentencing court. Absent such a motion, sentencing courts had no authority to modify a prisoner's sentence for compassionate release. Id.

Congress never defined what constitutes an "extraordinary and compelling reason" for resentencing under Section 3582(c). But the legislative history to the statute gives an indication of how Congress thought the statute should be employed by the federal courts. The Senate Committee stressed how some individual cases, even after the abolishment of federal parole, still may warrant a second look at resentencing:

> The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defendant was convicted have been later amended to provide a shorter term of imprisonment.

S. Rep. No. 98-225, at 55-56 (1983) (emphasis added). Congress intended that the circumstances listed in § 3582(c) would act as "safety valves for modification of sentences," id. at 121, enabling judges to provide second looks for possible sentence reductions when justified by various factors that previously could have been addressed through the abolished parole system. This safety valve statute would "assure the availability of specific review and reduction of a term of imprisonment for 'extraordinary and compelling reasons' and [would allow courts] to respond to changes in the guidelines." Id. Noting that this approach would keep "the sentencing power in the judiciary where it belongs," rather than with a federal parole board, the statute permitted "later review of sentences in particularly compelling situations." Id. (emphasis added).

Congress initially delegated the responsibility for outlining what could qualify as "extraordinary and compelling reasons" to the U.S. Sentencing Commission ("Commission"). See 28 U.S.C. § 994(t) ("The Commission . . . shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."). The Commission took considerable time to promulgate its policy in response to Congress's directive. It finally acted in 2007, almost a generation later, with the very general guidance that "extraordinary and compelling reasons" may include medical conditions, age, family circumstances, and "other reasons." U.S.S.G. § 1B1.13, app. n.1(A). However, this guidance did little to spur the BOP to file on behalf of prisoners who might have met these general standards. After a negative Department of Justice Inspector General report found that the BOP rarely invoked its authority under the statute to move for reduced sentences, the Commission felt compelled to act again. See U.S. Dep't of Justice, Office of the Inspector General, The Federal Bureau of Prisons' Compassionate Release Program, I-2023-006 (Apr. 2013). The Commission amended its policy statement on "compassionate release" in November 2016. See U.S.S.G. § 1B1.13 Amend. (11/1/2016). In addition to broadening the eligibility guidelines for sentencing courts, the new policy statement admonished the BOP for its past failures to file motions on behalf of inmates who had met the general criteria identified in U.S.S.G. § 1B1.13. See U.S.S.G. § 1B1.13, n.4; see also United States v. Dimasi, 220 F. Supp. 3d 173, 175 (D. Mass. 2016) (discussing the history of the BOP, DOJ and Commission's interplay in developing guidance for "compassionate release" motions). Notably, the Commission concluded that reasons beyond medical illness, age, and family circumstances could qualify as "extraordinary and compelling reasons" for resentencing. Id., n.1(A) (including a category for "Other Reasons," when there is "an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."). But see United States v. Cantu, No. 1:05-CR-458-1, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019) (holding that, given the changes to the compassionate release statute by the First Step Act, U.S.S.G. § 1B1.13, application note 1(D) "no longer fits with the statute and thus does not comply with the congressional mandate that the policy statement must provide guidance on the appropriate use of sentence-modification provisions under § 3582."); United States v. Fox, No. 2:14-CR-03-DBH, 2019 WL 3046086, at *3 (D. Me. July 11, 2019) ("I treat the previous BOP discretion to identify other extraordinary and compelling reasons as assigned now to the courts."); United States v. Cantu-Rivera, No. CR H-89-204, 2019 WL 2578272, at *2 n.1 (S.D. Tex.

June 24, 2019) ("Because the current version of the Guideline policy statement conflicts with the First Step Act, the newly-enacted statutory provisions must be given effect."); United States v. Beck, No. 1:13-CR-186-6, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019) (holding that application note 1(D) is "inconsistent with the First Step Act, which was enacted to further increase the use of compassionate release and which explicitly allows courts to grant such motions even when BOP finds they are not appropriate," and courts thus may "consider whether a sentence reduction is warranted for extraordinary and compelling reasons other than those specifically identified in the application notes to the old policy statement"); but see United States v. Lynn, No. CR 89-0072- WS, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019) (holding that application note 1(D) governs compassionate release reductions of sentence and federal judges have no authority to create their own criteria for what constitutes an "extraordinary and compelling" reason for resentencing).

The Commission's actions, however, did little to change the dearth of filings by the BOP on behalf of inmates who satisfied the Commission's general guidance. During the more than three decades during which the BOP was the exclusive gatekeeper for "compassionate release" motions, very little effort was made to implement Congress's intention to provide a safety valve to correct injustices or allow relief under extraordinary and compelling circumstances.

Finally, this changed with the passage of the First Step Act in 2018. See P.L. 115-391, 132 Stat. 5194, at § 603 (Dec. 21, 2018). Section 603 of the First Step Act changed the process by which § 3582(c)(1)(A) compassionate release occurs: instead of depending upon the BOP Director to determine an extraordinary circumstance and move for release, a court can now resentence "upon motion of the defendant," after the inmate exhausted administrative remedies with the BOP, or after 30 days from the receipt of the inmate's request for compassionate release with the warden of the defendant's facility, whichever comes earlier. 18 U.S.C. § 3582(c)(1)(A). Thus, under the First Step Act, a court may now consider the defendant's own motion to be resentenced, without waiting for it to be made by the BOP.

Courts are now authorized to consider a defendant's motion, even one which the BOP opposes, and order resentencing if a resentencing court finds that "extraordinary and compelling reasons" warrant a reduction and such a reduction is consistent with the Section 3553(a) factors. Id. Resentencing courts are also

advised that any decision to reduce a previously ordered sentence be "consistent with applicable policy statements issued by the Sentencing Commission." Id.

## B. THE COVID-19 OUTBREAK PRESENTS A COMPELLING AND EXTRAORDINARY CIRCUMSTANCE THAT WARRANTS COMPASSIONATE RELEASE FOR LINTON, WHO IS A HIGH-RISK FATALITY PATIENT

On March 11, 2020, the World Health Organization ("WHO") officially classified the new strain of coronavirus, COVID-19, as a pandemic. We have watched the inexorable progression of COVID-19 around the globe, helpless to stop its incursion across our borders. As a result, we now live in a world largely unrecognizable from that which we occupied a mere few weeks ago. Our everyday lives have, quite literally, ground to a halt. Indeed, the World Health Organization ("WHO") has classified COVID-19 as a global pandemic that has, as of the date of Linton's motion, infected 69,788,140 people worldwide and killed more than 1,585,727. We watch these bleak numbers exponentially increase every day. These numbers almost certainly underrepresent the true scope of the crisis; test kits in the United States have been inadequate to meet demand.

On March 13, 2020, the White House declared a national emergency, under Section 319 of the Public Health Service Act, 42 U.S.C. § 247(d)). On March 16, 2020, the White House issued guidance recommending that, for the next eight weeks, gatherings of ten persons or more be canceled or postponed. On March 20, 2020, Governor Andrew Cuomo ordered 100 percent of all non-essential workers to remain home, effectively shuttering New York state's entire economy. These drastic measures followed the issuance of a report by British epidemiologists, concluding from emerging data that 2.2 million Americans could die without drastic intervention to slow the global spread of the deadly disease.

The Centers for Disease Control and Prevention ("CDC") have also issued guidance related to the deadly effects of COVID-19 on certain high-risk patients of the population. The CDC identified the population most at risk of death from the disease to include adults over 50 years old with chronic medical conditions, such as lung disease, heart disease, chronic kidney disease, hypertension and diabetes. For these individuals, the CDC warned to take immediate preventative actions, including avoiding crowded areas and staying at home as much as possible. Id.

## C. THE CONDITIONS OF BOP INCARCERATION FOSTER THE SPREAD OF COVID-19, AND LINTON'S AGE RENDER HIM PARTICULARLY SUSCEPTIBLE TO AN UNREASONABLE RISK OF DEATH AND AN INABILITY TO TAKE PREVENTATIVE MEASURES OR SELF-CARE RECOMMENDED BY THE CDC

With the COVID-19 pandemic, it is only a matter of time before COVID-19 finds its way into FCI Gilmer, where Linton is housed. Conditions of confinement at FCI Gilmer create an optimal environment for the transmission of contagious disease. People who work in the facility leave and return daily; people deliver supplies to the facility daily; inmates were having social, legal and medical visits regularly after the initial spread of the virus prior to the BOP's decision to stop visits for 30 days on March 13, 2020. Public health experts are unanimous in their opinion that incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe," and "infection control is challenging in these settings." "Achieving a Fair and Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States" (March 2, 2020), at https://bit.ly/2W9V6oS.

Linton is powerless to take the preventative self-care measures directed by the CDC for his high-risk group to remain safe from COVID-19 infection. He cannot self-quarantine or partake in "social distancing" in his prison facility. There are also community spaces where inmates and prison staff gather, including a common room, laundry facilities, barber shop, medical areas, dining hall, small library and gym. These high-density areas are precisely the kind of spaces that have caused the alarmingly high-spread rates of COVID-19 in prison. Hand sanitizer, an effective disinfectant recommended by the CDC to reduce transmission rates, is contraband in jails and prisons because of its alcohol content. Correctional health experts worry that no matter what precautions are taken by crowded prisons, these facilities may become incubators for the COVID-19 disease.

During the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases because they could not maintain the level of separation and sanitation necessary to prevent widespread infection. "Prisons and Jails are

9

Vulnerable to COVID-19 Outbreaks," The Verge (Mar. 7, 2020), available at https://bit.ly/2TNcNZY.

The Prison Policy Initiative has called on American jails and prisons to release medically fragile and older adults, noting that these persons are at high risk for serious complications and even death from COVID-19. Similarly, members of Congress have written to the BOP to urge that efforts be made to allow immediate release of non-violent, elderly inmates. Letter of Representatives Jerrold Nadler and Karen Bass (March 19, 2020) ("DOJ and BOP must also do all they can to release as many people as possible who are currently behind bars and at risk of getting sick. Pursuant to 18 U.S.C. 3582(c)(1)(A), the Director of the Bureau of Prisons may move the court to reduce an inmate's term of imprisonment for "extraordinary and compelling reasons.").

Given that Linton is 45 years old and he is vulnerable to COVID-19, compelling and extraordinary circumstances exist to support compassionate release at this unique time in our country's history. There is an urgent need to act now, before the virus spreads within the prison and Linton becomes infected. In sum, the risk posed by infectious diseases in jails and prisons is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected.

In summary, the COVID-19 virus is highly transmissible, extraordinarily dangerous, and poses a severe threat of death to the high-risk medical profile of Linton. The conditions at FCI Gilmer do not allow Linton to take the self-care measures required by the CDC to protect him safety.

Accordingly, this Court should find that, in light of the heightened medical risk presented to Linton by the COVID-19 pandemic, there are extraordinary and compelling reasons to reduce Linton's sentence in the manner requested—to wit, releasing him from custody and requiring him to serve his sentence release on home confinement, on specified conditions.

This conclusion is supported by the application of the § 3553(a) factors. Linton has served a substantial majority of his prison sentence.

Section 3553(a) requires a sentencing court consider the "history and characteristics of the defendant" and "the need to provide the defendant with needed ... medical care." 18 U.S.C. § 3553(a). Viewed now in the light of a raging and virulent pandemic that has entered federal prisons and that poses a special risk

to Linton's health, these factors, together, now counsel allowing him to be released and serve his remaining time in home confinement. For reasons including those set out at length at Linton's no longer will present a meaningful danger to the community if at liberty. And the conditions of his forthcoming home confinement will meaningfully restrict his freedom of movement during the remainder of the sentence.

## CONCLUISON

Under these reasons Linton is forced to seek relief from this Court to avoid imminent danger to himself. Accordingly, this Court should find that extraordinary and compelling reasons warranting a reduction of Linton's sentence, that he does not pose a danger to the community, that the § 3553(a) factors now support a reduction of sentence, and that the reduction sought is consistent with the Sentencing Commission's policy statement.

Respectfully Submitted,

_____
Ahmad S. Linton, pro-se

Dated: 12/7/20

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on 12/7, 2020 the foregoing PRO-SE MOTION IN SUPPORT OF MOTION TO REDUCE SENTENCE PURSUANT TO THE FIRST STEP ACT OF 2018 was served upon the U.S. Attorney for the District of Maryland via U.S. mail and pre-paid mail.